E-FILED
Thursday, 01 December, 2016  02:32:27 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS, PEORIA DIVISION

| | | |
|---|---|---|
| STEVEN COLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No: 15 CV 1292 |
| v. | ) | |
| | ) | |
| DETECTIVE SHAWN MEEKS and | ) | |
| THE CITY OF PEORIA, | ) | |
| | ) | Jury Trial Demanded |
| Defendants. | ) | |

## SECOND AMENDED COMPLAINT

NOW COMES Plaintiff, STEVEN COLE, by and through his attorneys, The Law Offices of Kathleen T. Zellner, P.C., and for his Second Amended Complaint against Defendants, states as follows:

### Introduction

1. This action is brought pursuant to 42 U.S.C. Section 1983 to redress the deprivation under color of law of plaintiff's rights as secured by the United States Constitution.

2. Specifically, as a result of the egregious misconduct and abuse by law enforcement officials as more fully described below, Plaintiff Steven Cole was wrongfully charged, arrested, prosecuted, and convicted of crimes he did not commit.

3. Plaintiff asserted his innocence for many years without success. Plaintiff was tried and convicted. Thankfully, the Illinois Appellate Court reversed his conviction outright.[1] The majority found the evidence completely unsatisfactory. The concurring Justice proclaimed

---

[1] The State did not file a Petition For Rehearing or a Petition For Leave to Appeal to the Supreme Court. Plaintiff was released almost immediately after the Appellate Court issued its opinion.

"the evidence in this case establishes Steven Cole's innocence, not his guilt," adding "I am baffled as to why the State even accused [Plaintiff] of this crime." He concluded "I have never seen anything like this case. I hope I never do again."

### Jurisdiction and Venue

4. This Court has jurisdiction of the action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

5. Venue is proper under 28 U.S.C. § 1391(b) because the events giving rise to Plaintiff's claims occurred in this judicial district and the parties resided in this judicial district at the time the events took place.

### The Parties

6. Plaintiff, Steven Cole ("Steven") was at all relevant times herein a resident and citizen of the State of Illinois.

7. Defendant, Shawn Meeks ("Defendant Meeks"), was at all relevant times herein employed as a police officer in the City of Peoria Police Department. The constitutional violations herein were undertaken with the assistance of, and participation by, other Peoria Police Department employees, presently known and unknown.

8. Defendant City of Peoria is an Illinois Municipal Corporation, and was at all times the employer of Defendant Meeks. The City of Peoria is responsible for the acts of Defendant Meeks while employed by the City of Peoria and while acting within the scope of his employment, pursuant to its statutory obligation to indemnify him.

9. Defendants Meeks was engaged in the conduct complained of under the color of state law and in the course and scope of his employment.

10. Defendant Meeks is sued in his individual capacity.

**Allegations of Fact**

*M.A.'s Constipation and Fecal Impaction*

11.     Karissa Miles ("Miles") has admitted that from the time her daughter M.A. was born (April 20, 2007) M.A. suffered from bouts of constipation.

12.     On occasion, when M.A. would become constipated, M.A. would cry and scream.

13.     M.A.'s constipation caused her to suffer from fecal impaction.

14.     In order to assist M.A. to defecate, Miles has admitted she performed a maneuver to manually assist M.A. which involved Miles moving M.A.'s legs and "spreading her butt apart."

15.     In the days prior to January 8, 2009, M.A. was again constipated and fussy due to her constipation.

*Initial Investigation*

16.     On January 8, 2009, Miles and her roommate, Jon Duncan ("Duncan"), a certified nursing assistant, took Miles' 20 month old daughter M.A. to the emergency room at Saint Francis Hospital.

17.     M.A. was admitted to the hospital and underwent surgery for injuries to her vaginal and anal area.

18.     Thereafter, but still on or about January 8, 2009, Miles and Duncan spoke to Defendant Meeks and advised that Duncan had examined M.A. while wearing blue latex gloves prior to transporting M.A. to the emergency room.

19.     Defendants Meeks spoke to medical personnel on or about January 8, 2009, and he was advised that M.A.'s injuries could have occurred as recently as two hours prior to the time

she arrived at the hospital. Medical personnel also advised that the injuries to M.A. could have been the result of an accident.

20. Defendant Meeks proceeded to Miles and Duncan's home and, with the assistance of an evidence technician, conducted a search of the premises.

21. The blue latex gloves were present at the premises and a photograph of the scene shows the presence of the blue latex gloves at the time of the search.

22. Miles and Duncan had told Defendant Meeks prior to the search that Duncan had examined M.A. while wearing blue latex gloves.

23. Defendants Meeks observed the premises to be filthy and in disarray. Beer bottles were strewn throughout the residence, there appeared to be hoarding taking place, and a pile of dog feces was located in the bedroom wherein M.A. had been sleeping.

24. Defendant Meeks observed the blue latex gloves that Miles and Duncan had told them Duncan had used to examine M.A. and discarded them. Having been used to examine M.A., the blue latex gloves contained physical evidence that would have ultimately identified the true attacker of M.A. Upon information and belief, Miles used the blue latex gloves when she manipulated M.A.'s body to relieve her fecal impaction.

25. Defendant Meeks knew the blue latex gloves contained exculpatory evidence. None of the evidence that could have been taken from the blue latex gloves would have tied the assault to Steven. The blue latex gloves would have tied Miles and Duncan, and potentially others, to the injuries suffered by M.A.

26. The blue latex gloves were not collected as evidence.

27. Both Miles and Duncan have admitted that they never saw the blue latex gloves again.

28. The blue latex gloves possessed evidentiary value similar to a rape kit. The blue latex gloves would have contained evidence such as feces because the latex gloves had been used to manually attempt to assist M.A. to defecate and relieve her fecal impaction.

29. The evidentiary value of the latex gloves to Defendant Meeks was obvious.

30. A number of other items were collected. However, Defendant Meeks discarded some of the clothes M.A. had been wearing. The discarded clothes possessed the same evidentiary value as the latex gloves. The evidentiary value of the clothes to Defendant Meeks was obvious.

31. Neither Miles nor Duncan advised Defendant Meeks that when Miles spoke to Steven on January 8, 2009, that Steven expressed anger and told Miles not to involve him and give the police his name.

32. The police proceeded to Steven and his wife, Janet's, home.

*Steven and Janet Cole*

33. At that time and place, Steven and Janet had been happily married for 13 years.

34. Steven and Janet were law-abiding citizens, lifelong residents of the area, and productive members of society that donated their time and money to charitable causes.

35. Steven lost his father when he was four years old as the result of a tragic accident. Steven's mother died of cancer when she was 46 years old.

36. As a result, Steven was raised by his stepfather, a military man, who instilled in him structure, respect, and integrity.

37. Steven had worked as a radio dispatcher for the Peoria County Sheriff's Department when he was 17 years old.

38. After graduating from Limestone High School in 1971, Steven enlisted in the 182nd tactical air support group, Air National Guard, and served honorably for six years.

39. After that, Steven began his career with Caterpillar in East Peoria where he would work for 35 years, receiving many awards and commendations.

40. In 1982, Steven purchased and operated Lawless Health Food Store in Peoria while at the same time supporting the Small Business Association and St. Jude's Children's Hospital of Central Illinois.

41. Steven raised two sons who became productive, law-abiding citizens.

42. Janet has raised two children of her own and they became productive, law-abiding citizens.

43. Steven and Janet shared several grandchildren, and enjoyed spending time with them and each other.

44. Always helping others if they had the means and ability to do so, Steven and Janet often assisted Miles by caring for her daughter, M.A., in their home. They treated M.A. like their own child, setting up a playpen and providing toys for M.A.'s frequent visits.

45. Steven and Janet had watched M.A. in their home on January 7, 2009, the day before Defendant Meeks arrived at their door.

*January 7, 2009*

46. Janet met Miles in 2005. On May 10, 2008, Steven met Miles at a picnic. From that point forward, Miles began leaving M.A. with Steven and Janet on Tuesdays and Thursdays.

47. On January 7, 2009, M.A. was suffering from one of her bouts of constipation.

48. Miles and her friend Doug dropped M.A. off at the Coles and left Miles' car with Steven as he had agreed to help repair it for Miles.

49. At approximately 2:15 or 2:30 p.m., Miles changed M.A.'s diaper and put her down for a nap before Steven took Miles to work.

50. At approximately 5:30 p.m., M.A. woke from her nap and Janet noticed she had a bad bowel movement when changing her diaper. M.A.'s rear end and anus were red, and M.A. said "owie" and flinched when Janet cleaned her with a wipe. Janet was not surprised or taken aback and did not call Steven. Janet put Vaseline on the sore areas and later notified Miles.

51. At approximately 9:20 or 9:30 p.m., Steven and Janet drove Miles home and Steven helped her take M.A. inside.

52. M.A. was constipated that evening and suffered from fecal impaction.

53. During the course of the evening, M.A. began to cry and scream because of her constipation.

54. Miles drank an excessive amount of alcohol that evening.

55. In fact, by her own admission, Miles drank 6-8 beers, maybe even more.

56. In order to attempt to relieve M.A.'s fecal impaction, Miles attempted to manually assist M.A. by manipulating her body, which included spreading her "butt" apart as she had in the past.

57. Miles was severely intoxicated and in manipulating M.A.'s body caused injury to M.A. M.A.'s injuries included a laceration through the posterior vagina, through the perineal body, and through a portion of the anal sphincter.

58. The injuries M.A. suffered are consistent with those that would be inflicted by an improper manipulation of her body and "butt."

59. During that evening, Miles had an approximately sixty-minute call with a friend about vaginal injuries.

***January 8, 2009***

60. On January 8, 2009, Steven and Janet were confronted by Defendant Meeks as well as other members of the Peoria Police Department and law enforcement.

61. Defendant Meeks interviewed Steven and Janet as to their activities the preceding day, including the care they provided to M.A.

62. Steven and Janet were completely honest, cooperative, and answered all the questions posed to them. Steven and Janet were consistent with the information they provided.

63. Nothing Steven and Janet said on that day, or any other day, suggested in any way that they had done anything whatsoever to harm M.A.

64. However, Defendant Meeks prepared false police reports after his interview of Steven that attributed statements to Steven that he never made.

65. Defendant Meeks also prepared false police reports after his interview of Janet that attributed statements to Janet that she never made.

66. Defendant Meeks falsely reported that Steven and Janet gave inconsistent responses during those interviews.

67. Defendant Meeks also reported that Janet advised them that when she changed M.A.'s diaper on January 7, 2009, she observed M.A. to be abnormally red and injured and exclaimed "Oh My."

68. This was false. Janet advised Defendant Meeks that she exclaimed "Oh Mya" but not due to any abnormal appearance by M.A.

69. Defendant Meeks also reported that Janet advised them that when she changed M.A. on January 7, 2009, she was "taken aback."

70. This was false. Janet never advised Defendant Meeks she was taken aback when she changed M.A.'s diaper on January 7, 2009.

71. Defendant Meeks never reported that he had disposed of the latex gloves Duncan had used to examine M.A.

### *"Investigation" Produces <u>No Evidence</u> of Probable Cause*

72. There never was any evidence whatsoever that Steven had caused M.A.'s injuries.

73. Still, Defendant Meeks continued to attempt to gather evidence to implicate Steven and Janet.

74. Steven and Janet's family and friends were confronted by Defendant Meeks and others suggesting to them that Steven and Janet were guilty of harming M.A.

75. As of March 24, 2009, Defendant Meeks was aware that there was absolutely no evidence and no probable cause suggesting Steven or Janet committed any crimes related to M.A.

76. Indeed, on March 24, 2009, one investigative report reflected that, "At this time, [an] unknown perpetrator is indicated with no evidence to support the targeted perpetrator." Steven was the "targeted perpetrator."

77. No evidence was developed against Steven or Janet between March 24, 2009, and April 1, 2009. Probable cause never existed against Steven or Janet.

### *Arrest and Charges*

78. Still, on or about March 31, 2009, Steven was indicted, arrested, and charged with aggravated criminal sexual abuse, aggravated battery, and 2 counts of predatory criminal sexual assault. Steven's bond was set at $200,000.00.

79. Absent the evidence fabricated by Defendant Meeks, Steven would never have been indicted, arrested, charged, prosecuted, convicted or wrongfully imprisoned.

80. The fabricated evidence was used to secure Steven's indictment, arrest, prosecution, conviction, and wrongful imprisonment.

81. On March 24, 2009, Janet was indicted, arrested and charged with obstructing justice and child endangerment. Janet's bond was set at $75,000.00.

82. Absent the evidence fabricated by Defendant Meeks, Janet would never have been indicted, arrested, charged, prosecuted, and wrongfully convicted.

83. The fabricated evidence was used to secure Janet's arrest, indictment, prosecution, and wrongful conviction.

84. The arrests and charges were procured through the presentation of false evidence to the Grand Jury by Defendant Meeks.

*Impossibility of Guilt*

85. Defendant Meeks selectively gathered physical evidence and selectively tested certain items in an attempt to obtain evidence against Steven.

86. Despite law enforcement claims that semen was found in five areas on a diaper at Miles and Duncan's home, no DNA profile could be identified.[2]

87. Despite the fact that a single sperm was obtained from a baby wipe taken from Miles and Duncan's home, no DNA profile could be extracted from the single sperm.

88. Prior to Steven's arrest, Defendant Meeks knew that Steven had undergone a vasectomy.

---

[2] The Appellate Court responded to this claim by noting, "It does not take a CC of bodily fluid to get a DNA profile."

89. Defendant Meeks also knew or should have known that except in the rarest of cases, a man who has undergone a vasectomy cannot produce sperm.

90. Indeed, as defense expert Dr. James Kenny testified, while it may be possible for a man that has had a vasectomy to produce sperm, it is also possible to "win the Mega Millions tomorrow" and possible that "we're invaded by aliens."

91. Dr. Kenny's opinion that it was nearly impossible for Plaintiff to produce sperm has never been publicly rebutted. No expert would ever be produced that contradicted him.

92. Due to the fact that Steven had a vasectomy, Defendant Meeks was well aware that Steven had not harmed M.A. Undaunted by the lack of evidence, Defendant Meeks pressed on with his narrative.

*Conviction*

93. Based on false statements and false reports fabricated by Defendant Meeks, Janet was indicted, arrested, charged, and subsequently forced to plead guilty.

94. Based on false statements and false reports fabricated by Defendants Meeks, Steven was indicted, arrested, charged, and proceeded to trial.[3]

95. Based on the fabricated and false evidence, and because other evidence was withheld, Steven was found guilty.

96. At the time he was sentenced, Steven was 59 years old. He had no prior convictions other than five traffic violations between 1985 and 1992. Twenty-one letters submitted to the court attested to his good character and expressed disbelief that he could have committed the offenses.

97. Steven was sentenced to 25 years in prison.

---

[3] In separate proceedings, Janet was forced to plead guilty to false accusations created by Defendants against her.

98. Steven, as a result of his incarceration, suffers from post traumatic stress disorder. He has nightmares and often wakes up screaming. During his time in prison, he had nine to ten different cell mates, many of some of whom were violent. Steven was forced to eat his meals in four minutes.

99. Steven did not receive any tickets nor commit any rule infractions during his entire time in prison.

*Appellate Court*

100. As noted above, in a scathing commentary on what Steven was forced to endure, the Appellate Court found the evidence insufficient and vacated Steven's conviction outright.

101. The Appellate Court explained that no physical evidence linked Steven to the offense, no one witnessed him assault M.A., and she was in the care of other individuals besides Steven, including other men, during the timeline of events created by the State.

102. The Appellate Court also noted that the jury was not free to reject the uncontradicted medical testimony presented by Dr. Kenny that Steven could not have emitted the sperm found on the baby wipe.

103. There were additional findings by the Appellate Court. The seasoned concurring Justice explained that:

> The evidence in this case established Steven Cole's innocence, not his guilt. This is the type of charge that will ruin a defendant's life, acquittal or no acquittal ... I am left baffled as to why the State even accused [Steven] of this crime ... Steven and Janet Cole, through no fault of their own, have become characters in an American horror story that even Stephen King could not have written... I cannot understand how this man found himself charged, let alone sitting in a penitentiary convicted of this horrific crime ...

104. But Steven did find himself in the penitentiary, where he would remain for years.

105. As a direct result of Defendant Meeks' conduct, Steven sustained physical injuries and damages including loss of his freedom, pain and suffering, severe mental anguish, emotional

distress, loss of income, inadequate medical care, humiliation, indignities and embarrassment, degradation, permanent loss of natural psychological development, and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and freedom of speech and expression.

### COUNT I

### 42 U.S.C. § 1983
### (Withholding of Exculpatory Evidence)

106. Each paragraph of this Complaint is incorporated as if restated fully herein.

107. As described more fully above, Defendant Meeks deliberately withheld exculpatory evidence. In doing so, Defendants Meeks violated his clearly established duty to report all material exculpatory and impeachment information to prosecutors.

108. Defendant Meeks deliberate withholding of exculpatory evidence includes but is not limited to his failure to provide the aforementioned blue latex gloves and other evidence to the prosecution and defense. Defendant Meeks knew the blue latex gloves were exculpatory.

109. Absent Defendant Meeks' misconduct, the indictment, arrest and prosecution of Steven could not and would not have been pursued, and Plaintiff would not have been convicted.

110. Defendant Meeks' misconduct directly and proximately resulted in the unjust and wrongful indictment, arrest, criminal conviction, and imprisonment of Plaintiff, Steven Cole, thereby denying him his constitutional right to a fair trial, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

111. As a direct and proximate result of this violation of his constitutional right to a fair trial, Plaintiff, Steven Cole, suffered injuries, including but not limited to loss of liberty, physical sickness, mental anguish and emotional distress.

112. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights. Defendant Meeks' actions directly and proximately caused the injuries and damages to Steven as claimed above, and constitute due process violations under the 14th Amendment of the United States Constitution.

### COUNT II

### 42 U.S.C. § 1983
### (Fabrication Of Evidence)

113. Each paragraph of this Complaint is incorporated as if restated fully herein.

114. As described more fully above, Defendants Meeks while acting under color of law and within the scope of his employment, fabricated evidence he knew to be false.

115. As a result of knowingly fabricating evidence, Defendant Meeks knew or should have known Steven was innocent.

116. Defendant Meeks continued his investigation of Steven despite knowing or having should have known Steven was innocent.

117. The evidence fabricated by Defendant Meeks was used to secure Steven's indictment, arrest, conviction and imprisonment. But for that fabricated evidence, Steven would not have been indicted, arrested, convicted, or imprisoned.

118. After the fabricated evidence was used to indict and arrest Steven, the fabricated evidence was indirectly used at trial to secure Steven's unjust and wrongful conviction, resulting

in Steven serving years of unjust and wrongful incarceration as well as causing him to face unwarranted charges and prosecution.

119. Defendant Meeks' fabrication of evidence directly resulted in the arrest, indictment, criminal conviction, and wrongful imprisonment of Steven, thereby denying his constitutional due process rights.

120. Absent this misconduct, the indictment, arrest, charges, prosecution, and wrongful imprisonment of Steven could not have and would not have been pursued, much less resulted in his conviction.

121. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and with a willful indifference to Steven's clearly established constitutional rights.

122. Defendant Meeks' actions directly and proximately caused the injuries and damages to Steven as claimed above, and constitute due process violations under the 14th Amendment of the U.S. Constitution.

## COUNT III

### 42 U.S.C. § 1983
### (Federal Malicious Prosecution[4])

123. Each paragraph of this Complaint is incorporated as if restated fully herein.

124. In the manner described above, Defendants Meeks, acting as an investigator, as well as under color of law and within the scope of his employment, accused Steven of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against

---

[4] Plaintiff recognizes that this Circuit currently holds that malicious prosecution is not actionable under 42 U.S.C. § 1983. Other Courts of Appeals have taken the opposite position. The United States Supreme Court has accepted a Petition For Writ of Certiorari on the issue. Plaintiff pleads the claim here under the Fourth and Fourteenth Amendments to preserve the issue.

Steven without any probable cause for doing so and in spite of the fact that he knew Steven was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments.

125. In so doing, Defendant Meeks caused Steven to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

126. The misconduct described in this Court was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

127. As a direct and proximate result of Defendant Meeks' misconduct described in this Court, Steven suffered loss of liberty, great mental anguish, humiliation, degradation, physical, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### COUNT IV

### Illinois State Law
### (Malicious Prosecution)

128. Each paragraph of this Complaint is incorporated as if fully set forth herein.

129. Defendants Meeks initiated and/or continued a malicious prosecution against Steven, without probable cause. Defendants Meeks was instrumental in the initiation and perpetuation of the prosecution of Plaintiff. Defendant Meeks acted with malice.

130. This prosecution was terminated in Steven's favor on May 7, 2015, after Steven had been incarcerated approximately 32 months.

131. Defendant Meeks is liable for this malicious prosecution because it was proximately caused by his unlawful actions as set forth above.