IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| Steven Cole, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | Case No. 15-1292 |
| ) | |
| Detective Shawn Meeks, *et al.*, ) | |
| ) | |
| Defendants. ) | |

## **MEMORANDUM OPINION AND ORDER**

This matter is now before the Court on Defendants' Motion for Summary Judgment (Doc. 64). For the reasons set forth herein, the Court GRANTS IN PART and DENIES IN PART Defendants' Motion. The Court GRANTS the Motion as it relates to Plaintiff's withholding exculpatory evidence claim under federal law (Count I). The Court DENIES the Motion as it relates to Plaintiff's State of Illinois malicious prosecution, indemnification, and respondeat superior claims (Counts IV, V, and VI).

## **OVERVIEW**

Plaintiff Steven Cole brings this action against Defendants Shawn Meeks and the City of Peoria pursuant to 42 U.S.C. § 1983 and Illinois state law. Plaintiff alleges that as a result of misconduct and abuse by law enforcement officials, he was wrongfully charged, prosecuted, and convicted of crimes he did not commit. Defendants respond that they are entitled to judgment as a matter of law, as there is insufficient evidence to support Plaintiff's due process claim, there was probable cause to charge and prosecute Plaintiff, and the City cannot be held liable for an injury resulting from an act of its employee where the employee is not liable.

## FACTUAL BACKGROUND

The following facts are uncontested. In the spring of 2007, Karissa Miles gave birth to a baby girl, whom the Court will refer to as "M.A." In January 2009, when M.A. was approximately twenty months old, Miles would frequently have others babysit her daughter while she was at work. During that time, Miles lived with Jonathan Duncan, a twenty-four-year-old certified nursing assistant, who was Miles' platonic friend and roommate. Miles was also good friends with Steven and Janet Cole. The Coles had become like surrogate parents to Miles since Miles befriended their son, Steve, and since Miles' mother had been diagnosed with stage-four cancer. The Coles began babysitting for M.A. as early as the summer of 2008.

On the morning of January 7, 2009, Miles was given a ride to the Cole residence so the Coles could babysit M.A. and so that Steven Cole could work on her car. According to a contemporaneous police report, Miles arrived at the Cole's between 12:00 p.m. and 1:00 p.m. and left with Mr. Cole around 2:30 p.m., as Steven was driving Miles to work. Before she left, Miles changed M.A.'s diaper. Miles did not see M.A. again until the Coles, along with M.A., came to pick her up at work around 9:00 p.m. With M.A. sleeping in the back seat, the four then drove to Miles' house where Miles removed M.A. from her car seat and laid her asleep on the couch in the living room.

What happened in the next fifteen hours is not completely clear, but Miles testified that she drank six to eight beers while M.A. was sleeping on the couch and Miles was talking to a friend on the telephone. Duncan was at home and asleep in his room until it was time for him to shower and get ready for his 11:00 p.m. shift at St. Francis Hospital. Duncan had volunteered to pick up an extra shift that evening and left the residence at approximately 10:30 p.m. to report to work. Between 11:30 p.m. and midnight, Miles made her way to bed for the evening and took

M.A. with her. Both slept in the same bed until approximately 7:00 a.m. the next morning when Miles noticed M.A. tugging at the rear of her diaper. Upon pulling the back of M.A.'s diaper open, Miles discovered blood in M.A.'s diaper. Miles stated she quickly brought M.A. downstairs where the diapers and wipes were, and after removing her daughter's diaper, discovered that M.A.'s vagina had been severely torn. Unsure of what to do next, Miles stated that she called Duncan at work and sent him a text message after her calls went unanswered. Miles explained to Duncan what she had found and requested that he come home immediately. Duncan then instructed Miles to grab some latex gloves and Q-tips and have them ready for him to inspect M.A. when he arrived home. Duncan arrived home shortly thereafter, inspected M.A.,[1] and announced that M.A. needed to be taken to a hospital immediately.

Once at the hospital, M.A. was triaged to the Pediatric Resource Center (which performs medical evaluations for children when there is a concern of abuse or neglect), where she was examined by staff physician Dr. Channing Petrak. Dr. Petrak concluded there was extensive trauma to M.A.'s genitals and that M.A. would need an exam under anesthesia to determine the depth of her injury and, if necessary, surgical repair. Dr. Petrak also concluded that the medical findings of M.A.'s initial examination were consistent with non-accidental trauma in the form of sexual abuse. Upon that determination, a sexual assault kit was collected from M.A. in the operating room and Dr. Amy Stanfill performed the medical procedure to repair M.A.'s genital laceration. Months later, the results of the examination of the sexual assault kit were produced. There was no semen found on the vaginal, oral or anal swabs; and blood was found on the vaginal swab.

---

[1] It is contested whether Duncan actually used the latex gloves to examine M.A. Duncan testified at Plaintiff's criminal trial that "[he] didn't even put on the gloves." (Ex. 68-16 at 20:22.) Yet Plaintiff references multiple exhibits which demonstrate Duncan said he did put the gloves on to examine M.A. (*See, e.g.*, Ex. 72-5 at 3.)

While M.A. was being treated at the Pediatric Resource Center, Detective Shawn Meeks from the Peoria Police Department was called over to investigate a report of possible child abuse against M.A. During the next few days, Meeks interviewed Miles, the Coles, and Duncan concerning their interaction with M.A. in the timeframe preceding her trip to the hospital. In the weeks thereafter, Detective Meeks drew the conclusion that Miles and Duncan were not viable suspects, and that the Coles required closer scrutiny because they provided inconsistent statements and declined to be interviewed by authorities a second time. According to Meeks, as the investigation began to drag on without any additional leads, Meeks expressed his frustration with the Coles' unwillingness to participate in a second interview with a Peoria County Assistant State's Attorney. It was then that the Assistant State's Attorney suggested impaneling a Grand Jury to investigate the allegations of child abuse and to issue a subpoena on the Coles in order to get them to testify. The Grand Jury could also vote to return a true bill of indictment.

On February 3, 2009, February 10, 2009, February 24, 2009, March 24, 2009, and March 31, 2009, a Grand Jury was impaneled and proceeded to investigate the allegations of child abuse against M.A. On the aforementioned dates, it heard testimony from Meeks, Miles, the Coles, and David McCubbins (the biological adult son of Janet Cole). The State's Attorney's Office chose not to seek a subpoena for Mr. Duncan's testimony. Each individual who was issued a subpoena by the Grand Jury provided testimony at the hearings. The Coles provided some preliminary information at the hearing and then invoked their Fifth Amendment right against self-incrimination during questioning. On March 31, 2009, the Grand Jury returned four indictments against Steven and Janet Cole.[2] The indictments included two counts of predatory criminal sexual assault of a child, one count of aggravated battery of a child, and one count of

---

[2] Janet Cole eventually pleaded guilty to one count of attempt[ed] obstructing justice on April 25, 2013, and was sentenced to four days in the Peoria County Jail. (Ex. 69-10 at 4-5.)

aggravated criminal sexual assault. Steven Cole was arrested and taken into custody that same day.

A three-day jury trial for Steven Cole was held on September 5, 2012, through September 7, 2012. The jury returned a guilty verdict on all three felony counts against him. Shortly thereafter, Cole was given a twenty-five-year sentence for predatory criminal sexual assault of a child, under which the other convictions were merged. Six years, one month, and seven days from his initial arrest, Steven Cole's conviction was overturned. In a lengthy and critical ruling, the Illinois Appellate Court held that Cole had been denied a fair trial by the State's improper comments in its closing argument and that there was insufficient evidence to sustain Cole's conviction for predatory sexual assault of a child. *People v. Cole*, 2015 IL App (3d) 120992-U. On December 1, 2016, Cole filed the claims at hand, alleging that as a result of misconduct and abuse by Detective Shawn Meeks, including Cole's subsequent conviction and imprisonment, Cole has sustained physical and emotional injuries, including post-traumatic stress disorder, and is entitled to damages.

**PROCEDURAL HISTORY**

Plaintiff filed his initial Complaint in this case on July 15, 2015, outlining multiple claims against six defendants. (Doc. 1.) On January 26, 2016, Plaintiff filed his Amended Complaint, narrowing his claims to two Defendants, Shawn Meeks and the City of Peoria. (Doc. 31.) The Amended Complaint alleged seven counts and included the claims at hand. On February 8, 2016, Defendants filed their first Motion to Dismiss. (Doc. 33) On April 21, 2016, this Court granted Defendants' Motion as to counts II, IV, and V, and denied the Motion as to counts I, III, VI, and VII. *Id.*

On December 1, 2016, Plaintiff filed his Second Amended Complaint. (Doc. 48.) The Second Amended Complaint alleges six counts: (I) a claim under 42 U.S.C. § 1983 for withholding exculpatory evidence; (II) a § 1983 claim for fabricating evidence; (III) a § 1983 claim for federal malicious prosecution; (IV) a malicious prosecution claim under Illinois state law; (V) an Illinois state law indemnification claim against the City of Peoria; and (VI) an Illinois state law respondeat superior claim against the City of Peoria. (Doc. 48 at 13-17.) On January 3, 2017, Defendants filed their second Motion to Dismiss. (Doc. 51.) In an Order dated January 27, 2017, this Court granted Defendants' Motion as to counts II (with prejudice) and III (without prejudice). (Doc. 54.) Defendants filed their summary judgment motion on Plaintiff's four remaining counts (I, IV, V, and VI) on November 27, 2018. (Doc. 64.) Plaintiff responded on January 15, 2018 (Doc. 71), and Defendants replied on February 7, 2018 (Doc. 76). This Order follows.

## LEGAL STANDARD

"The purpose of summary judgment is not to try a question of fact, but rather to determine whether a genuine issue of material fact exists." *Williams v. Manchester*, 888 N.E.2d 1, 8 (Ill. 2008). A court shall grant summary judgment where there is no genuine issue as to any material fact and the moving party has demonstrated he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "A material fact is one that might affect the outcome of the suit." *Williams v. Brooks*, 809 F.3d 936, 941-42 (7th Cir. 2016) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "In determining whether a genuine issue as to any material fact exists, a court must construe the pleadings, depositions, admissions, and affidavits strictly against the movant and liberally in favor of the opponent." *Manchester*, 888 N.E.2d at 8. "A triable issue precluding summary judgment exists

where the material facts are disputed or where, the material facts being undisputed, reasonable persons might draw different inferences from the undisputed facts." *Id.* at 9. Summary judgment should only be allowed where the right of the moving party is clear and free from doubt. *Id.*

## DISCUSSION

Defendants move for summary judgment on all four counts of Plaintiff's Second Amended Complaint. In short, Defendants argue there is insufficient evidence to demonstrate Detective Meeks intentionally withheld exculpatory evidence from M.A.'s child abuse investigation; there was probable cause to charge and prosecute Cole for, *inter alia*, predatory sexual assault of a child; and the City of Peoria cannot be held liable on either indemnification or respondeat superior grounds for an injury resulting from an act of its employee where that employee is not liable. No matter the actual prospects at trial, the Court must keep in mind just how favorable the summary judgment standard is to the non-movant. Accordingly, as discussed *infra*, the Court finds a reasonable factfinder could find for Plaintiff on Counts IV, V, and VI, but not on Count I, of his Second Amended Complaint.

**Count I: Withholding Exculpatory Evidence under 42 U.S.C. § 1983**

"Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness." *McCarthy v. Pollard*, 656 F.3d 478, 483 (2011) (citing *California v. Trombetta*, 467 U.S. 479, 485 (1984)). This standard of fairness requires that defendants be afforded a meaningful opportunity to present a complete defense. *Id.* To safeguard this right, the Supreme Court developed "what might loosely be called the area of constitutionally guaranteed access to evidence." *Id.* Taken together, "this group of constitutional privileges delivers exculpatory evidence into the hands of the accused, thereby

protecting the innocent from erroneous conviction and ensuring the integrity of our criminal justice system." *Id.* at 483-84.

In *McCarthy v. Pollard*, the Seventh Circuit established the requirements for a federal claim of withholding exculpatory evidence. It ruled that "the destruction of potentially exculpatory evidence violates the defendant's right to due process if (1) the State acted in bad faith; (2) the exculpatory value of the evidence was apparent before it was destroyed; and (3) the evidence was of such a nature that the petitioner was unable to obtain comparable evidence by other reasonably available means." *Id.* at 485. A finding of bad faith turns on "the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Arizona v. Youngblood*, 488 U.S. 51, 56 n.* (1988). Additionally, "to show bad faith, [Plaintiff] must prove 'official animus' or a 'conscious effort to suppress exculpatory evidence.'" *Jones v. McCaughtry*, 965 F.2d 473, 477 (7th Cir. 1992) (quoting *Trombetta*, 467 U.S. at 488). In *Arizona v. Youngblood*, the Supreme Court held that the police's failure to refrigerate the victim's clothing and to perform tests on the clothing's semen samples was, at worst, "negligent," and the Court failed to conclude that the destruction of that evidence rose to the level of bad faith. 488 U.S. at 58.

Here, Plaintiff argues Detective Meeks should have located and preserved blue latex gloves that were purportedly used to examine M.A. by Mr. Duncan after Duncan returned home from work on the morning of January 8, 2009. Plaintiff contends he was unable to present the gloves as exculpatory evidence during his trial in September 2012 because Meeks failed to retrieve the latex gloves from his search of Miles' residence. Plaintiff states "[t]he gloves alone were evidence that [Plaintiff] would have presented at his trial to show that someone, not him, examined M.A., and that examination caused and/or exacerbated M.A.'s injury." (Doc. 71 at

68.) Plaintiff concludes that "the gloves very likely would have revealed the identity or other evidence of the true attacker of M.A." *Id.* Since Meeks failed to collect the latex gloves, and because the gloves were the only evidence which may have exonerated Plaintiff, Plaintiff asserts that Meeks acted in bad faith. The Court disagrees.

If anything, Detective Meeks' brief interviews of Miles and Duncan immediately preceding his search of their home would have indicated that Miles' daughter had a serious injury which may have been caused by sexual abuse; the child was approximately twenty-months old, wore diapers, and was observed with blood coming from her vagina and on her diaper; Duncan and Miles lived together and Duncan worked as a CNA at St. Francis Hospital; Miles urged Duncan to return early from work and Duncan performed a visual inspection of M.A. (thus, negating the use of latex gloves) before announcing that M.A. needed to go to the hospital; and Miles had consumed multiple beers the night before the injury to M.A. was discovered. (*See* Exs. 16, 18, 31, 35.)

Even when viewing the facts and inferences in the light most favorable to Plaintiff, it is unreasonable to infer Detective Meeks would have intuitively understood the alleged gravity of the latex gloves on or around January 8, 2009. The initial police reports and investigation documents mention nothing of latex gloves. (Exs. 19, 20, 21, 22, 28, 29, 35, 36, 37.) Those reports include lengthy summaries written by other investigating officials excluding Meeks. Additionally, Meeks and Officer Tuttle did end up collecting valuable evidence from both the Miles' and Coles' residence within hours after Meeks had been summoned to the Pediatric Resource Center to initiate his investigation. That evidence included three diapers from the kitchen garbage can at the Miles residence, a used diaper found on top of the dishwasher from the Miles residence, three used diapers from the floor of Miles' bedroom, a used diaper that was

on top of the dresser in Miles' bedroom, two Q-tips and one wipe found in one of the diapers from the kitchen garbage at the Miles residence, two diapers from the Cole residence (one which Miles had changed and the other which either Steven or Janet Cole had changed), and three hobby horses from the Coles' residence. (Ex. 35.) Coincidentally, tested but unidentifiable sperm was found on a wipe inside a diaper from the top of the dishwasher at the Miles residence and was used to convict Plaintiff.[3] On the diaper itself, there was tested but unidentifiable semen.

Finally, Plaintiff fails to provide substantiated evidence and/or argumentation that suggests the blue latex gloves Duncan purportedly used to examine M.A. would have: (i) exonerated Plaintiff; (ii) demonstrated that M.A.'s injuries were exacerbated; and (iii) revealed the identity of the true attacker of M.A. More importantly, Plaintiff also fails to provide substantiated evidence and/or argumentation that Detective Meeks acted with "animus" or "a conscious effort to suppress exculpatory evidence" when he failed to collect and preserve the latex gloves from Miles' residence on January 8, 2009, or at any time thereafter.[4] As such, there is insufficient evidence in the record upon which a reasonable jury could return a verdict for Plaintiff on this claim. Defendants' Motion for Summary Judgment on Count I is GRANTED. The Court dismisses Plaintiff's § 1983 claim of withholding exculpatory evidence against Defendant Shawn Meeks with prejudice.

---

[3] During Plaintiff's criminal jury trial, the prosecution asked the jury if it was "more likely" or "more reasonable" to believe the sperm was produced by a man who had a vasectomy (which Plaintiff had) or by a "mystery person" who "somehow got rid of his 999 million other sperm and left only one." The jury ultimately found Plaintiff guilty of three child-abuse related offenses.

[4] Meeks asserts he did not see any latex gloves in the house during his search (Ex. 68-1 at 63:4-65:1) and Duncan testified he never used the gloves to examine M.A (Ex. 68-16 at 20-21). Also, despite Plaintiff's contention to the contrary, blue latex gloves are not identifiable from any photo taken of diapers in the garbage can at the Miles residence. (Ex. 32.)

**Count IV: Malicious Prosecution under Illinois State Law**

To prevail on a claim for malicious prosecution under Illinois law, the plaintiff must prove "(1) the commencement or continuance of an original or civil judicial proceeding by the defendant[s] [against the plaintiff]; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff." *Swick v. Liautaud*, 662 N.E.2d 1238, 1242 (Ill. 1996) (citing *Joiner v. Benton Community Bank*, 411 N.E.2d 229, 232 (Ill. 1980)). "The failure to establish any one of these elements precludes recovery for malicious prosecution." *Sang Ken Kim v. City of Chicago*, 858 N.E.2d 569, 574 (Ill. App. Ct. 2006).

"When a defendant moves for summary judgment, he may meet his initial burden of production either by affirmatively showing that some element of the cause of action must be resolved in his favor, or by demonstrating that the plaintiff cannot produce evidence necessary to support the cause of action." *Id.* (citing *Fabiano v. City of Palos Hills*, 784 N.E.2d 258, 265 (Ill. App. Ct. 2002), *abrogated on other grounds by Barnes v. Martin*, No. 2-14-0095, 2014 WL 6978235 (Ill. App. Ct. Dec. 9, 2014)). "In either case, the defendant must produce evidence that would clearly entitle him to judgment as a matter of law." *Sang Ken Kim*, 858 N.E.2d at 574. "Once the defendant satisfies his initial burden of production, the burden shifts to the plaintiff to present some factual basis that would arguably entitle the plaintiff to a favorable judgment." *Id.*

In the situation at hand, Defendants contend Steven Cole fails to demonstrate a lack of probable cause for the charges brought against him on March 31, 2009. (Doc. 64 at 42-48). Defendants add that probable cause existed for Mr. Cole's indictment and arrest based on the incontrovertible facts known to Detective Meeks concerning the nature, discovery, and timeframe of the injury to M.A.; the medical evidence indicating a crime occurred; the limited

universe of individuals who had the opportunity to commit the crime; and the evidence suggesting Mr. and Mrs. Cole attempted to cover up the truth of M.A.'s injury. *Id.* Plaintiff counters by arguing that while evidence of a crime against the victim was certainly present, that evidence failed to demonstrably link the crime to Plaintiff. (Doc. 71 at 81.) Furthermore, Plaintiff argues that but for Meeks' slanted testimony before the Grand Jury, Plaintiff would have never been charged with—and prosecuted for—predatory sexual assault of a child. *Id.* at 83-85.

"Probable cause is a state of facts that would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged." *Fabiano*, 784 N.E.2d at 266 (citing *Adams v. Sussman & Hertzberg, Ltd.*, 684 N.E.2d 935, 944 (Ill. App. Ct. 1997). The existence of probable cause is a mixed question of law and fact. *Id.* "Whether the circumstances proved to show probable cause are true is a question of fact, but, if true, whether [the circumstances] amount to probable cause is a question of law to be decided by the court." *Ely v. National Super Markets, Inc.*, 500 N.E.2d 120, 124 (Ill. App. Ct. 1986) (citing 25 Ill. Law & Practice Malicious Prosecution § 42 (1956)). "Although an indictment is prima facie evidence of probable cause, it is not conclusive evidence of probable cause and may be rebutted by . . . evidence that the indictment was obtained through false testimony before the grand jury." *Barnes v. Martin*, 2014 IL 140095, ¶ 54 (citing *Freides v. Sani-Mode Manufacturing Co.*, 211 N.E.2d 286, 289 (Ill. 1965)).

As it relates to Plaintiff's malicious prosecution claim under Illinois law, this Court finds that there is sufficient evidence in the record upon which a reasonable jury could draw an inference that the true bill of indictment returned by the Grand Jury on March 31, 2009, charging Steven Cole with predatory sexual assault of a child was obtained through false testimony by Detective Meeks. In support of its finding, the Court directs the parties to Detective Meeks'

testimony at the initial hearing before the Grand Jury on February 3, 2009. Meeks, questioned by Assistant State's Attorney Pattelli, testified as follows:

> Q: So the incident was discovered by the mother on Thursday?
>
> A: The 8th.
>
> Q: January 8th. And when it was discovered what -- where was the child at, in what area? Was it in Peoria County?
>
> A: Yes. It's actually on the Peoria city, Peoria county line, street that divides the two.

. . . .

> Q: <u>And this would have been at whose residence that the child was discovered injured</u>?
>
> A: <u>The residence of Steven Cole and Janet Cole</u>.
>
> Q: And how long had the child been there at that residence? Was that hours or --
>
> A: The child was taken there -- the mother had gone there. Mother had spent some time at the residence, and I think they got there about noon. And then the mother left for work around 2:15 to 2:30 and was taken there by Steven Cole. The child stayed with Janet Cole. And then Steven came right back after he dropped the mother off at work.
>
> Q: Was that on Wednesday?
>
> A: That would have been Wednesday afternoon. And then she stayed there until approximately 8:15 to 8:30 Wednesday night when they went back with the child to pick up the mother from work and to take the mother and the child home to their home.
>
> Q: <u>So, conceivably, this most likely happened after Wednesday at noon, correct</u>?
>
> A: <u>Correct</u>.
>
> Q: Okay.
>
> A: Now, the mother claims she changed the diaper of the child while they were at the Cole's residence at about 2:15, and she said the child had messed herself. Upon changing the diaper, there was nothing wrong with her.
>
> Q: So to narrow the suspects, basically, it would be whoever probably had contact with the child in the household from after noon on -- after noontime on

> Wednesday to [when] the injury was discovered on Thursday according to the mother, correct?

A: Correct.

Q: <u>And who would have been people that had access to the residence at that time as far as you can thus determine</u>?

A: <u>The residence of the baby-sitter</u>?

Q: Yeah. Where this -- where the child was located.

A: Again, it was assured Steven and Janet Cole were both there. Their adult son[5] had come by there that late afternoon, early evening time.

Q: So he couldn't be ruled out as a suspect, could he?

A: Correct.

. . . .

Q: Pursuant, then, to the crime being alleged and the nature of it, did you try to talk to any of these people who had custody of the child? Now, obviously, you did talk to the mother, correct?

A: Correct.

Q: Did the mother appear to be truthful in terms of where the child was at and, in essence, when the injury was discovered?

A: Yes. She was very cooperative through the whole thing.

Q: Did she appear upset at the discovery of this?

A: Yes.

Q: So you are taking into consideration in essence as to when the injury was alleged to have occurred and where it did occur at, correct?

A: Correct.

Q: Did you attempt then to talk with the people, the Coles and Mr. McCubbins then?

A: Yes.

---

[5] Janet Cole's biological son, David McCubbins.

Q: And where did we get on that?

A: The following -- again, the child had gone into surgery, so we didn't have a lot of medical information. I guess it would be Thursday. So it would be Friday morning I went to -- I initially went and spoke with the first baby-sitter, Devita Vogel,[6] and she cooperated very much. When I got done with her, I then went to the Cole's residence, knocked on the door. Originally got no answer. Called the phone number that was provided, and it was answered by Steven. <u>Informed him that I was there, and that's when he basically said that he had talked to an attorney and gave me the name of the attorney</u>.

Q: So you were not able to talk with him further in regards to this case, correct?

A: Well, actually, he gave me the name and number of his attorney. I made several phone calls and was eventually able to contact that attorney who after talking to him briefly he said that he could call the Coles back and have them go ahead and speak with us. So I went back to the Cole's house and got a brief statement from both Steven and Janet Cole.

Q: And what did they say about this?

A: <u>They have no knowledge of the -- they basically said they have no knowledge of anything. Through the rest of the investigation of talking to a huge array of people that were involved in this, there were a lot of areas concerning their original statements that were not consistent</u>.

. . . .

Q: [by Grand Juror] And the parents didn't indicate the son was alone with the baby at any time?

A: <u>Their original story to me was that there was no one else in the house, period. And then they later contacted me and said that their son had, in fact, been at the residence, that they had -- it was an oversight on their part, that he had actually been there, but it was only for a short period of time</u>.

. . . .

Q: [by Grand Juror] So no one had changed this 20-month-old's diaper from 2:15 the day before until the next morning?

A: The mother reported she changed the diaper before they left. Actually, everybody conferred with that, said that that was true. The mother -- when I talked to the mother, she stated that the baby-sitter Janet told her that she had just changed the diaper before they left the house. <u>When I talked to Janet, she gave me a different story</u>. And then, no, the mother did not change the diaper

---

[6] Ms. Vogel babysat for M.A. the night of January 6, 2009 (Ex. 72-2 at 4), and was ruled out as a suspect by Detective Meeks during his investigation (Ex. 68-1 at 31:9-33:6.)

> -- when they came home the child was asleep, she laid the child down. The child never did wake back up until the following morning. So she did not change the diaper after they arrived home.

(Doc. 67-7 at 7:4-11; 7:14-9:10; 10:19-12:20; 17:22-18:5; 19:13-20:3) (emphasis added).

Meeks' testimony on February 3, 2009, is noteworthy because of its prevalent stream of inaccurate information. The injury to M.A. was discovered on Thursday, January 8, 2009, but it was not discovered at the Cole residence as Meeks testified, but was discovered by Ms. Miles at the Miles/Duncan residence on Thursday morning. Meeks also testifies that the injury to M.A. most likely occurred sometime after Wednesday (January 7, 2009) at noon despite an absence of persuasive circumstantial evidence that would substantiate his statement as of that date. Moreover, Meeks actively redirects questioning by Mr. Pattelli to the residence of the Coles when Pattelli asks Meeks to name the individuals that would have had "access to the residence" between noon on Wednesday until "the injury was discovered on Thursday according to the mother." Additionally, a discrepancy in the timing of a diaper change at the Cole residence,[7] may appear to pale in comparison to the fact that Miles herself failed to mention to investigators that she had initially texted Duncan indicating M.A. needed to go to the hospital and there would undoubtedly be questions about the injury and it would be better if they answered them together.[8]

Finally, what is most startling to the Court is that Detective Meeks implicates Steven and Janet Cole with the sexual abuse of M.A. because they utilized their right to counsel before questioning by authorities. Yet, once questioned, the Coles provided direct information (Ex. 68-

---

[7] One of Meeks' preliminary police reports states, "During the conversation with Karissa she said Janet informed her that Janet had changed [M.A.'s] diaper right before leaving the house to pick Karissa up from work Wed night." (Ex. 67-8 at 2.) A separate preliminary police report states, "I was later advised that [the Coles] turned over two diapers to [Officer Tuttle] and was told one was a diaper Karissa changed at their residence before she left for work and the other was a diaper Janet changed around [5:00 p.m. - 6:00 p.m.] on Wednesday. (Ex. 67-12 at 3.)

[8] *People v. Cole*, 2015 IL App (3d) 120992-U, ¶ 55.

1 at 76:9-77:9; 79:19-80:24; 82:12-84:5.) The Coles also notified the police that Janet's son had visited them on the afternoon of Wednesday, January 7th (Ex. 68-13 at 199:20-23), and they cooperated with Detective Meeks on January 8th at 2:45 p.m. when Meeks called to arrange for Officer Tuttle to stop by their residence to collect any diapers that may have been changed on M.A. the day prior (Exs. 67-12 at 3; 67-13 at 4; 68-13 at 5-7). To further complicate matters, although Meeks appeared quite confident in front of the Grand Jury as to Steven Cole's culpability, Meeks conceded several times in his own deposition that he lacked probable cause to arrest Plaintiff prior to the impaneling of the Grand Jury. (Ex. 4 at 134:24-135:1; 136:20-22; 138:3-23.)

The existence of probable cause is a mixed question of law and fact. *Fabiano*, 784 N.E.2d at 266. "Whether the circumstances proved to show probable cause are true is a question of fact . . ." *Ely*, 500 N.E.2d at 124. At the summary judgment stage, questions of fact are left to the determination of a jury. Whether Detective Meeks provided false statements to the Grand Jury in order to return a bill of indictment against Steven Cole is a factual issue for a jury to decide. *Rivera v. Guevara*, 319 F.Supp.3d 1004 (7th Cir. 2018). Accordingly, Defendants' motion for summary judgment on Plaintiff's malicious prosecution claim is DENIED.

**Counts V and VI: Indemnification and Respondeat Superior Claims**

Since Plaintiff's claim against Detective Meeks, who was acting in his official capacity under color of law as a Detective with the Peoria Police Department during the alleged violation, will proceed toward trial, Plaintiff's indemnification and respondeat superior claims against the City of Peoria will move forward as well. *See* 745 ILL. COMP. STAT. 10/9-102 (2018) ("A local public entity is empowered and directed to pay any tort judgment or settlement for compensatory damages (and may pay any associated attorney's fees and costs) for which it or an employee

while acting within the scope of his employment is liable in the manner provided in this Article."); *Simon v. Northwestern University*, 175 F.Supp.3d 973, 984-85 (N.D. Ill. 2016) (ruling that "respondeat superior is not an independent cause of action and must be predicated on an underlying tortious act by the accused's employee or agent," and allowing the claim to survive as the accompanying state law malicious prosecution claim was allowed to proceed.)

**District Court Pendent Jurisdiction**

With the granting of Defendants' motion for summary judgment concerning the federal claim over which it has original jurisdiction, the Court addresses whether to retain jurisdiction over the remaining state law claims. The jurisdiction of the Court over Plaintiff's § 1983 claims is based on the federal question statute, 28 U.S.C. § 1331, which grants federal district courts original jurisdiction over cases "arising under the Constitution, laws, or treaties of the United States." The jurisdiction of the Court over Plaintiff's state law claims is based on the supplemental jurisdiction statute, 28 U.S.C. § 1367(a), which extends the jurisdiction of federal district courts to all claims that are sufficiently related to the claim or claims on which their original jurisdiction is based to be part of the same case or controversy within the meaning of Article III of the Constitution. After Plaintiff's § 1983 claim was dismissed, federal jurisdiction over Plaintiff's remaining claims is based entirely upon the supplemental jurisdiction statute.

The supplemental jurisdiction statute codified judge-made principles of pendent jurisdiction. *Wright v. Associated Insurance Companies Inc*., 29 F.3d 1244, 1251 (7th Cir. 1994). Pendent jurisdiction is a doctrine of discretion. *Id.* (citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)). Thus, a district court should consider and weigh the factors of judicial economy, convenience, fairness and comity in deciding whether to exercise jurisdiction over pendent state-law claims. *Wright,* 29 F.3d at 1251 (citing *Carnegie-Mellon University v. Cohill*,

484 U.S. 343, 350 (1988)). The general rule is that, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state law claims rather than resolving them on the merits. *Id.* (citing *Gibbs*, 383 U.S. at 726)). There are, however, unusual cases in which the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness and comity—will point to federal decision of the state-law claims on the merits. *Id.* Another occasion for retaining state law claims occurs when "substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort." *Id.* (quoting *Graf v. Elgin, Joliet & Eastern Railway Co.*, 790 F.2d 1341, 1347-48)). Finally, the Supreme Court has emphasized the "commonsense policy of pendant jurisdiction," as it entails the "conservation of judicial energy and the avoidance of multiplicity of litigation." *Rosado v. Wyman*, 397 U.S. 397, 405 (1970)).

Here, the commonsense policy of pendent jurisdiction is appropriate. For over the last three years, this Court has directly addressed Plaintiff's federal and state law claims. It is undeniable that the claims are part of the same case or controversy within the meaning of Article III of the Constitution. Plaintiff's case originated in this Court and has gone through the entire cycle of pretrial litigation under its jurisdiction. In these circumstances, judicial economy would not be served through the district court's relinquishment of jurisdiction. Other district courts in the Seventh Circuit have elected to retain jurisdiction under similar circumstances. *See Birdo v. Gomez*, 214 F. Supp. 3d 709 (N.D. Ill. 2016); *Bible v. Stratton*, 14 CV 325, 2016 WL 7116135 (S.D. Ill. Nov. 10, 2016); *Satkar Hospitality Inc. v. Cook County Bd. of Review*, 819 F. Supp. 2d 727 (N.D. Ill. 2011). Accordingly, the Court finds there is a significant balance of factors favoring retention of jurisdiction over the surviving state law claims under Plaintiff's Second Amended Complaint.

## CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART. Count I (withholding exculpatory evidence pursuant to 42 U.S.C. § 1983) is DISMISSED WITH PREJUDICE. The Motion for Summary Judgment is DENIED as to Counts IV (malicious prosecution), V (indemnification), and VI (respondeat superior). The Court will contact the Parties to establish the remaining trial schedule.

ENTERED this 28th day of September, 2018.

/s/ Michael M. Mihm
Michael M. Mihm
United States District Judge